

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. PD-1429-14

### KENNETH NEAL WALKER, Appellant

### v.

### THE STATE OF TEXAS

### NO. PD-1430-14

### SHELLEY WALKER, Appellant

### v.

### THE STATE OF TEXAS

### ON APPELLANTS' PETITIONS FOR DISCRETIONARY REVIEW
### FROM THE TWELFTH COURT OF APPEALS
### SMITH COUNTY

JOHNSON, J., delivered the opinion of the Court in which MEYERS, HERVEY, ALCALÁ, RICHARDSON, and NEWELL, JJ., joined. YEARY, J., filed a concurring and dissenting opinion in which KELLER, P.J., and KEASLER, J., joined.

## O P I N I O N

The state alleged that appellants, Kenneth and Shelley Walker, had immersed the feet of their

granddaughter, Bridget, in hot water, causing her to suffer second-degree burns to her feet and ankles. A jury found appellants guilty of injury to a child and sentenced each of them to 25 years' imprisonment. The court of appeals affirmed the convictions.

In their petitions for discretionary review in these consolidated appeals, the appellants contend that the court of appeals erred in holding that the evidence was sufficient to sustain their convictions. Specifically, appellants now assert that the jury's conclusion that they intentionally immersed Bridget's feet in the hot water is based on the drawing of multiple unreasonable inferences and is thus too speculative to give rise to any criminal liability in this case.

Because we conclude that the evidence in this case can rationally be said to establish nothing more than a mere suspicion of wrongdoing by appellants, the evidence is insufficient to prove that either appellant engaged in the conduct at issue in this case–namely intentionally immersing Bridget Walker in hot water. Therefore, we hold that no reasonable trier of fact could have found all the elements of the offense of injury to a child beyond a reasonable doubt. We also hold that, given that the evidence fails to prove beyond a reasonable doubt the commission of any criminal conduct by either appellant, the convictions may not be reformed to any lesser-included offense. We therefore reverse the judgments of the court of appeals and render judgments of acquittal.

**Background**

Appellants were charged with intentionally or knowingly causing serious bodily injury to a child, Bridget, who was three weeks shy of her third birthday at the time of the alleged offense. *See* TEX. PENAL CODE § 22.04(a)(1). The indictments alleged that appellants held Bridget in hot liquid, thereby causing burns to her feet and legs. The jury instructions permitted the jury to convict each appellant either as a primary actor or as a party to the offense. *See id.* §§ 7.01(a), 7.02(a)(2), (a)(3). Appellants were both convicted of the offense after a consolidated trial, and they were each

sentenced to twenty-five years' imprisonment. The jury also made a finding that appellants had used

a deadly weapon, a hot liquid, during the commission of the offense.

On direct appeal, appellants challenged the sufficiency of the evidence, but the court of

appeals rejected their challenges and affirmed their convictions. *See Shelley Walker v. State*, No.

12-12-00379-CR, 2014 WL 4637964 (Tex. App.—Tyler Sept. 17, 2014) (mem. op., not designated

for publication); *Kenneth Walker v. State*, No. 12-12-00378-CR, 2014 WL 4637963 (Tex.

App.—Tyler Sept. 17, 2014) (mem. op., not designated for publication). In its opinion upholding

Shelley Walker's conviction, the court of appeals reasoned that "conflicting inferences may be drawn

from the evidence in this case—Bridget's injuries are the result of (1) forced submersion, or (2) an

accident in which Bridget entered a bathtub containing scalding water and could not immediately

exit." *Shelley Walker*, 2014 WL 4637964, at *14. The court further explained,

> It is undisputed that B.W. and [her brother] N.W. had not taken the Walkers'
> attempts at discipline seriously because the children would laugh when they were
> disciplined. It is also undisputed that the children had a history of playing with water
> in the bathrooms and had flooded Appellant's bathroom the week before B.W. was
> injured. These facts, when viewed in light of the prosecution's demonstration and
> testimony that B.W.'s burns were more consistent with forced submersion than an
> accidental burn, support the inference that, upon finding B.W. playing in Appellant's
> bathroom with the water running and soaps thrown into the bathtub, Appellant
> disciplined B.W. by holding her feet in the scalding water.

*Id.* The court of appeals acknowledged the existence of some evidence that was "consistent with

[Bridget] diving out of the bathtub," including the scratches on her leg and chest and the fact that the

shower door was off its track, and of the evidence showing that both appellants had health conditions

that "could have made the forced submersion of Bridget difficult," but the court concluded that these

facts "do not render the jury's verdict speculative." *Id.* The court of appeals observed that the state

had presented evidence showing "that it would have been possible for Appellant to forcibly

submerge [Bridget] in scalding water because Appellant was mobile and able to move around." *Id.*

The court of appeals concluded that it was bound to defer to the jury's credibility and weight determinations, and it upheld Shelley Walker's conviction. *Id*.

The appellate court relied on nearly identical reasoning in upholding Kenneth Walker's conviction, but it additionally noted in its separate opinion in that case that Shelley Walker had given a statement to investigators indicating that Kenneth was "gone two to three minutes before [Bridget] came into the living room with burned feet," and this was an additional circumstance supporting the inference that Kenneth, either on his own or with assistance from Shelley, had committed this offense. *See Kenneth Walker*, 2014 WL 4637963, at *14.

This Court granted review of the appellate court's sufficiency analyses in these cases.[1]

**Testimony**

Kenneth and Shelley Walker had moved into the rented duplex in Tyler in August of 2011. The duplex had three bedrooms, two bathrooms, a kitchen, and a combined living-dining area. The three bedrooms were accessible from a common hallway. One bathroom was in the master bedroom, the other opened into the common hallway. The master bedroom was occupied by Shelley, the Walkers' seriously ill and disabled son Kendal Walker, Kendal's wife Amanda Walker, and one of Shelley's grandchildren, Bridget Walker. Another bedroom was occupied by Kenneth, and the third bedroom was occupied by the Walkers' two grandsons, Toby, and Nicholas. There was a television set in the living area and another in the boys' room.

---

[1] "The Court of Appeals erred in finding legally sufficient evidence in this case, and allows this Court to reexamine the issue of factually sufficient evidence from *Brooks v. State*, 323 S.W.3d 893 (Tex. Crim. App. 2010).

"The Court of Appeals erred in allowing a speculative verdict to stand in contrast to this Court's instructions."

Because we hold that appellants' second ground for review is dispositive in resolving their sufficiency challenges, we do not consider their first ground for review, in which they urge this Court to overrule *Brooks* and reinstate the law of factual sufficiency.

Because of abuse and neglect by their biological parents (Kenneth's son Chris and Chris's wife), who were drug addicts, Kenneth and Shelley had legally adopted the three children. At the time Bridget was burned ("the event"), Toby was six years old and went to school. Nicholas was three years and 10 months old, and Bridget was 2 years and 11 months old. Bridget weighed about 28 pounds. According to medical records introduced at trial, Nicholas displayed Pervasive Developmental Disorder (PDD-NOS), part of the autism spectrum.[2] He was described by his aunt, Amanda Walker, as being "very mean" and having a history of violence that included "[h]itting, biting, kicking, throwing, [and] punching." The violence was directed to anyone in his way, but often at Bridget. Because of the violence, Nicholas was put on medication.

Nicholas was also the instigator of much misbehavior, while Bridget was the follower. The furniture was removed from his bedroom because he bounced on the beds, leapt from the dresser, and urged Bridget to do the same. The children liked to play in the bathrooms, and they frequently went into a bathroom, locked the door, then played in the tub, or blocked the sink and made it overflow, or put their heads in the toilet, or stopped up the toilet, causing it to overflow. Nicholas and Bridget would also get into the tub fully clothed and empty the shampoo bottles. They used the step stool to get onto the sink counter and squeeze toothpaste over the sink and counter. Five or six times, they had caused the tub to overflow with cold water. Because of that behavior, Kenneth had installed locks high on the doors leading to the hall bathroom and the master bedroom. According to Amanda, "[Nicholas] is the one that pulls Bridget in the bathroom and locks both of them in. Bridget will try to open the door, but she can't get it open." She also stated that, whenever the

---

[2] "Pervasive Developmental Disorder, Not Otherwise Specified (PDD-NOS) This mouthful of a diagnosis applies to most children with autistic spectrum disorder. Children whose autism is more severe than Asperger's syndrome, but not as severe as autistic disorder, are diagnosed with PDD-NOS."

http://www.webmd.com/brain/autism/autism-spectrum-disorders?page=2#2

children had been caught causing problems in a bathroom, they were always together. On a prior occasion, Kenneth had had to "bust" the bathroom door to get the children out and, on another occasion, had had to take the bathroom door off its hinges. There was no evidence of forcible entry into the bathroom on the day of the event.

Both Kenneth and Shelley had health issues. Based on medical records introduced at trial, Kenneth had had a heart attack and a stroke. He also had a dual-chamber pacemaker, degenerative discs in his lower back that necessitated facet injections,[3] carpal-tunnel syndrome, extensive arthritis in his right wrist, and significant numbness in his left hand. The third of three surgeries on his right wrist was performed a few months before the event. At the time of the event, Kenneth was disabled and did not work outside the home. Shelley was somewhat overweight and had deforming arthritis in her feet and multiple chronic-pain issues for which she was on medications. She also had allergies that at times decreased her ability to hear. She did not work outside the home.

On the morning of the event, February 28, 2012, Amanda rose at 4:30 a.m. and left for work before the others were awake. Shortly after 8:30 a.m., she began to get calls from Shelley. Because she was assisting residents of the nursing home where she worked, and because she would be disciplined for taking personal calls, she did not answer at first. When the calls became frequent, she finally answered.[4] Shelley told her that Bridget had burned her feet and asked what to do.

---

[3] Facet joints are located between each set of vertebrae in the spine. They allow each vertebra to move against the vertebra just above and just below it. Facet injections are used to reduce inflammation and swelling of tissue in and around the facet-joint space.

[4] According to one of the state's witnesses, Detective Craig Shine of the Tyler Police Department (TPD), after the event occurred sometime around 8:30 a.m., Shelley called Amanda, who was at her job in a nursing home. Shelley ask Amanda what she should do. From an examination of Amanda's telephone, Officer Shine established that Shelley had called Amanda at 8:38, 8:41, 8:48, 8:51, 10:30, 10:49, 10:57, 11:04, and 11:10 a.m. There was no call at 8:58 a.m.

In questioning the lead investigator, Det. Brock, the prosecutor indicated that the first call from Shelley was placed at 8:38 a.m. and stated that the correct times were known from looking at Amanda's telephone. (9 R.R. 48, 49). He then slightly misquoted the times of the first four calls (8:37, 8:41, 8:47, 8:50) testified to by Detective Shine (8:38, 8:41, 8:48, 8:51) and added a call at 8:58, which was not on the call log testified to by Det. Shine. The prosecutor also

Amanda is not medically trained and did not know. At some time before 9:00 a.m., Amanda went to her supervisor, who is a nurse, and asked what to do. She relayed her supervisor's instructions–call 9-1-1–then got permission to leave and clocked out at about 9:04 a.m.[5] During the last call before Amanda returned home, Shelley stated that Kenneth had already called 9-1-1. That statement is supported by the testimony of the police dispatcher, who testified that the 9-1-1 call from Kenneth came in at 8:55 a.m., and that of a paramedic who testified that the EMS unit was dispatched at 8:56.[6]

After the ambulance left with Bridget and Shelley, Kenneth, Amanda, and Nicholas remained in the house. Forensic technicians arrived at an unknown time, but more than 30 minutes after the event, and photographed the master bath and other areas of the house. The tub had not been drained. The hot-water faucet was still open and was adding water in a stream described by several witnesses as being pencil sized, and the water level had risen to the bottom of the overflow plate. Photographs show that there were eight plastic bottles floating in the tub, that the outer shower door had been displaced and was in the inner door's track at the bottom corner of the opening, and that two small pairs of underpants were on the floor close to the side of the tub. Photographs of Bridget taken at the hospital show a long scratch on the left side of her thorax and another long scratch on the front of her left thigh.

---

questioned Brock about the contents of an unrecorded interrogation of Amanda by Det. Nathan Elliott—at which Brock was not present—and asserted that Amanda had stated that the first call was at 8:58 a.m. (9 R.R. 50). The interview on which that claim depended was not introduced at trial, nor was there any indication that it had been recorded, nor did the interrogator, Det. Elliott, testify.

[5] The time was verified at trial by the testimony of Amanda's supervisor, Debra Cremers.

[6] At trial, the state made an issue of when Shelley first called Amanda, repeatedly stating that Amanda told a TPD detective that the first call was at 8:58 a.m., thus proving that the Walkers had waited a half hour before seeking medical help for Bridget. The interview on which that claim depended was not introduced at trial, nor was there any indication that it had been recorded, nor did the interrogator, Det. Elliott, testify.

Right after Bridget was burned, Kenneth turned the temperature on the water heater down from the highest setting to the next lowest setting. The technicians later visited a second time to measure the temperature of the water at the faucet. At the lower setting, the water at the faucet was at 120º F. The technicians then reset the water heater to the highest setting, as it had been when Bridget was burned, let it heat for 30 minutes, then tested the temperature at the faucet again. It was up to 131º F. No one disputed that the water pooled in the tub at the time of the event would have been at least slightly cooler, perhaps around 128º F.

The state called Amanda as a witness. Much of the state's questioning of Amanda required hearsay as an answer: what Shelley told her at the time of the event, later that same day, and in the days that followed. While some details differed, and were described by the state as being different stories, there were only three stories, one from Kenneth and two from Shelley, one of which was disavowed with an explanation. Kenneth's version differed from Shelley's affirmed version only in where Shelley and Nicholas were when Bridget was burned, but no version of the event included an assertion that either adult was in the bathroom when Bridget was injured. Except for the disavowed statement, all versions related that the Walkers heard Bridget screaming before they saw her or went down the hallway toward the master bath.

With respect to the disavowed statement, Amanda testified that Shelley told her that Shelley was going to say that she had been in the master bedroom with Nicholas folding laundry when she heard water in the bathroom, tried to open the door, and called for Kenneth, who was in the living room, when she couldn't open the door.[7] Shelley later confessed to Amanda and Det. Brock that she had said that because Nicholas had a history of violence and she was afraid that, if he was found to

---

[7] Shelley had folded laundry earlier in the day, a fact that was demonstrated by state's exhibits that showed folded laundry on the bed in the master bedroom.

have seriously harmed his sister, he would be taken away. Once Shelley acknowledged that her initial version was not accurate, the only variances in the sequence of events were whether Shelley was in the green recliner in the living room or in the kitchen giving Nicholas his medication when Kenneth heard Bridget crying and where Nicholas was when Bridget came down the hall crying.

Amanda testified that she had been told that Shelley had put Nicholas and Bridget in the boys' room to watch TV. Sometime later, Kenneth heard Bridget crying and looked down the hall. He saw Bridget and Nicholas coming out of Shelley's bedroom. Bridget walked down the hall saying, "I hurt my feet," then climbed into Shelley's lap. Nicholas said something similar. Bridget's feet were beet red up to just above her ankles and the skin was "bubbling up." Amanda repeatedly stated, in response to repetitive questions from the state, that Kenneth and Shelley had been consistent in their statements all during their incarcerations. The lead investigator, Det. Michelle Brock, disagreed. She testified that there were seven stories, but did not say in her testimony how the stories differed enough so as to constitute different stories or who told each of the various versions. Most of the differences that she noted were inconsistencies about where the family members were when the event took place.

At trial, the state's theory was that one or both of the adults became angry and deliberately immersed Bridget's legs in the hot water as discipline for playing in the bathroom, suspending her in mid-air with her feet in the water. Such a mechanism would result in uniform burning. Forcing her feet onto the bottom of the tub would have caused sparing of her soles, a condition that was not present.

The defense theory was that the two children, once again, had locked themselves in the bathroom and turned on the water in the tub. Because Nicholas was not burned, one could conclude that he did not get into the tub. The water got too hot, and Bridget wanted out, but her exit was

blocked, perhaps by Nicholas being "mean," or perhaps because he was standing in the open area throwing into the tub the bottles that were shown in photographs of the tub. All the while, the hot water continued to flow into the tub, and Bridget "flamingo-ed," taking one foot out of the water at a time in an effort to alleviate the pain. In her desperation, she grasped the lower edge of the shower door, pulling it off its track, and dragged herself over the track onto the bathroom floor, scratching herself on the metal edge of the track.

Among the witnesses who testified at trial were three physicians. State's witness Dr. Wolf is board certified in surgery and specializes in burn treatment. He first saw Bridget at Dallas Parkland Hospital the day after the event and continued to treat her while she remained in Dallas. His knowledge of her medical history was from notes in the hospital charts. The notes were taken by one of Dr. Wolf's residents. The version of the event that was taken from those notes, which Dr. Wolf related in court, is unlike any other version given to anyone and asserts that Shelley was attending to a child, other than Bridget, who was screaming and that Bridget was found in the tub.

Dr. Wolf testified that the burns were "fairly uniform with a straight line across on the ankles." The soles of Bridget's feet were burned to the same degree as the rest of the burns. The burns are partial thickness burns that would normally heal in 10-14 days without permanent marks. Dr. Wolf told the prosecutor that he would not expect a child with such burns to walk, but during cross-examination agreed that it would have been possible for Bridget to walk down the hall to get the attention of her parents.

When queried about the temperature required to cause Bridget's burns, Dr. Wolf testified that medical tables indicated that, at 131º, immersion in water for 10 to15 seconds would cause such burns and, allowing for the relative thinness of a child's skin, Bridget's burns would have occurred after perhaps 12 to18 seconds at 129º. There was extensive discussion of the significance of the lack

of splash marks on Bridget's legs. Dr. Wolf testified that, at 131º, even a thrashing child would be unlikely to show splash marks because splashed water would cool rapidly and be at a temperature sufficiently lower than 131º so that it could not burn skin and cause a splash mark. He agreed that, in the temperature range at issue, the lack of splash marks neither proved nor disproved intentional injury.

Dr. Wolf testified that the two long scratches on Bridget's body, which he had not noticed when he treated her but saw in a photograph at trial, were quite recent and were consistent with a child sliding over the metal track of a sliding shower door, but noted that "there are other explanations that are as possible."

At first, Dr. Wolf asserted that Bridget's feet sustained identical burns, but later agreed that, at least as shown in some photographs, the burn on her left leg was "somewhat" higher than on the burn on her right leg. The tub in the master bath had the drain on the right. Given the fact that tubs slope toward the drain and the water is therefore slightly deeper at the drain end, and given that Bridget's left leg showed a slightly higher burn mark than her right leg, the pattern of burning indicates that Bridget would have been facing out toward the shower door as opposed to facing the back wall of the shower enclosure. Dr. Wolf's conclusion about the burns was that Bridget "was unable to get out of the water . . . for a prolonged period of time, however that occurred." In response to a defense question that stated, "Now, because her feet were burned on the bottom, obviously, that means she was probably moving around in the bathtub; isn't that true?" He stated, "That is true."

The parties agreed that sparing[8] can be indicative of forced immersion. Because sparing was

---

[8] "Sparing" occurs when a section of skin is not directly in contact with the hot liquid, e.g., when the sole of the foot rests on the bottom of the liquid's container. Sparing produces a less severe burn. 6 R.R. 135-139.

not present, the state argued that the only option left that could explain Bridget's injuries was forcible immersion by suspending Bridget in the hot water. The defense, by contrast, suggested that the lack of sparing was a likely indicator of an accidental burn.

> Q (by defense) So if it's very unlikely that she was forced or held in that tub, we're kind of back to square one, aren't we?
>
> A (by Dr. Wolf) It's unlikely she was forced or held to the bottom of the tub. It doesn't mean that she wasn't put into the tub.
>
> Q   Are you trying to say that she was elevated for 10 to 15 seconds?
>
> A   I don't know.
>
> . . .
>
> Q   You would actually have to hold her and restrain her for up to 15 seconds.
>
> A   That's correct.
>
> Q   That is very unlikely, isn't it?
>
> A   It is as plausible as anything else.

6 R.R. 142, 162.

Dr. Wolf agreed that he knew nothing about the Walkers' health issues. When informed of those issues and when asked if he would be surprised that Kenneth was being accused of harming Bridget by suspending her in the water, his response was, "So, you'd really have to try with those medical conditions." He conceded that "you'd have to be pretty dang strong" and that it would be "pretty difficult" "to hold a 30-pound child still in water . . . for at least 10 to 15 seconds." Dr. Wolf offered an alternative–the water was sixteen inches deep instead of four inches, which would require less bending by the person holding Bridget in the water–but conceded that he had no evidence of

deep water.[9]

In response to a question by the prosecutor, Dr. Wolf agreed that forced immersion with the observed result required that the child's knees be held straight so that the child could not lift her feet up and so that the child could not thrash around, which would result in a lack of splash marks. Again, he stated that splash marks are neither indicative nor not indicative of forced immersion.

> Q (by defense)  Sorry, Doctor.  Just very briefly. If a detective in this case, part of the reason they brought charges is because they specifically cite lack of splash marks as being a sign that she was forcibly immersed, that would be incorrect?
>
> (Objection)
>
> A     Yes. So I saw–I'll repeat my testimony that in this case, it doesn't either–it doesn't either indicate nor refute whether this was forceful.
>
> Q     So certainly should not be a sign that says this is, in fact, child abuse, correct?
>
> A     That is correct.

6 R.R. 175-76.

Dr. Wolf concluded that the "most probable" explanation was forced immersion, but acknowledged that there could be other mechanisms.

State's witness Dr. Cox is a pediatrician who headed a child-abuse team at Dallas Parkland Hospital.  When asked about his involvement in Bridget's treatment, he stated that he "kind of looked at her, briefly talked to her grandmother, who was at the bedside, examined Bridget," and took some photographs while Bridget was in the ER as part of his documentation of her injuries. He followed Bridget when she was transferred to the burn unit.  He "examined her again, evaluated her again, [and] took more photos . . .."  10 R.R. 13.  He saw Bridget on February 28 and 29, but did

---

[9] The evidence showed that the tub was thirteen inches deep at the rim, thus Dr. Wolf's hypothetical involving 16-inch-deep water would have been impossible.

not follow-up after then. 10 R.R. 53. He noted the scratches and some bruises and testified that he "was very concerned" about possible child abuse. 10 R.R. 16. He also testified that he "was not overly concerned." 10 R.R. 45.[10]

Dr. Cox testified that he saw no grasp marks that indicated that Bridget had been restrained forcefully.

Q      See any hand marks, hand prints, anything like that that [sic] led you to believe she was forcefully held?

A      I didn't [see] any specific pattern injuries. She had bruises around her knee and hip but not any specific grasp mark, no.

Q      Nothing looked like where she'd been grasped and held, correct?

A      Not any particular pattern to her injury, no.

10 R.R. 95-96.

On the evening of February 29, he spoke with the Walkers and took a history of the event,[11] but deemed the context of the event, including the Walkers' physical conditions and the issues with Nicholas, "not part of the assessment of the pediatrician evaluating a 35-month-old."

Q      Okay. Did you ever stop and consider and factor in and see–and consider if these people were even physically capable of doing what you have theorized they've done?

A      My assessment was based on the pattern and the child. I don't do any test on the adult who caused the injuries, no.

Q      Okay. So you don't know, don't have any idea what their physical capabilities are?

A      Don't have any specific knowledge, no, sir.

---

[10] Dr. Cox testified that Bridget could not walk when she was admitted to Dallas Parkland, but there is no evidence that she was given the opportunity to do so and could not.

[11] 10 R.R. 14-15.

Q        So I'm assuming you believe–was it both Shelley and Kenneth Walker that participated in this?

A        What I know is they were both home. I don't know who caused the burns, I just know both grandparents were home at the time the injuries happened, based on their history.

10 R.R. 72-73.

Dr. Cox also explained how he thought the injury was inflicted.

Q        Okay. And if that child is getting out feet first–we can use State's Exhibit–the child is getting out, has got scratches on her front, if, according to your theory, Shelley or Kenneth Walker would be in front, and the child would be held like this (indicating)?

A        I would expect the child would be held in a different way than what you're portraying. They would use their body to hold her torso.

Q        Okay.

A        So their back to her torso would be the most likely,[12] and then holding right below her knees to keep her feet still as they submerged her feet in the water.

Q        And she's not going to be kicking, doing any of that, squirming?

A        You can use your body to try and hold her still, yes, sir.

Q        Okay. Leaning over the tub, down like this, all right, that's–and holding her steady?

A        Yes, sir.

Q        Okay. And that's the most plausible theory you have?

A        Well, I wasn't given any plausible history, but imagining, based on the pattern of the burns, I think that's the best explanation.

10 R.R. 77-78.

Contrary to the opinion of Dr. Wolf, Dr. Cox testified that lack of splash marks was an

---

[12] It is physically impossible to accomplish the purported action using the position Dr. Cox described. We assume that he meant to say that the child's back would have to be pressed to the adult's torso.

important factor in his determination that the scalding was intentional. He was shown an article in the Journal of Pediatrics, which he acknowledged as being a highly regarded medical journal. He acknowledged having read the article in question, which was, at least in part, the basis for the opinions of the other two doctors that the splash marks were not relevant to this case because the water was not hot enough for flash burns. He still stated that the water was hot enough to cause splash marks but then testified that he did not know what water temperature was required to create splash marks or the length of immersion at the known water temperature required to produce Bridget's burns. He also denied any possible alternative to forced immersion and stated, "Her pattern of burns, no, couldn't be accidental. It's just flat out non-accidental."[13] However, he also testified, "I don't know exactly who did it. I don't have enough information to say who did what, just that she sustained forced immersion burns, I can't say who did it or how it occurred exactly." 10 R.R. 94.[14]

The testimony of defense witness Dr. Lawrence indicated that he is board certified in family medicine, specializes in child abuse and burns, has treated hundreds of children with burns, and trains medical residents in child abuse and burns. His undergraduate degree is in mechanical engineering, and he is knowledgeable in the area of bio-mechanical issues. His only other appearance in court as a witness in a case was as a state witness involving an intoxicated patient that he had treated in the ER. He stated that he had agreed to testify for the defense in this case only after about 10 hours of document review and, after agreeing to testify, had spent about 20 more hours reviewing almost 700 pages of documents, including among other documents, CPS reports, police

---

[13] He conceded that children can scald themselves. 10 R.R. 54.

[14] "What I know is they were both home. I don't know who caused the burns. I just know both grandparents were home at the time the injuries happened, based on their history." 10 R.R. 73.

reports, medical records for Kenneth and Shelley, over 100 photographs of the house and Bridget's injuries, and Dr. Cox's deposition. In his opinion, the family's history is the most important aspect of determining whether abuse occurred. 10 R.R. 120. After reviewing the documents, he concluded that the injury to Bridget "was certainly an accident." 10 R.R. 129.

In accord with Dr. Wolf, Dr. Lawrence agreed that the burns required immersion for 10 to 15 seconds and that the burns could have been inflicted by forced immersion or by the child walking around in the water. In accord with Dr. Cox, he agreed that, at 131º F., the most plausible way that forcible immersion could have occurred was to turn the child's face away because a child threatened with pain "would do everything they can, including biting, if they're facing you." 10 R.R. 188.

In support of the defense theory of the case, Dr. Lawrence explained the physics of lifting weights; holding a 30-pound weight produces 30 foot-pounds of pressure on a human back if held one foot away from the body, 60 foot-pounds of pressure if the weight is two feet from the body, and so on. 10 R.R. 190-91. Because neither Kenneth nor Shelley were burned, he concluded that they were not in the tub. 10 R.R. 192. Therefore, if one of them had suspended Bridget in the water, that person would have had to hold Bridget at some distance away from that person's body. Dr. Lawrence also agreed that, to burn a child's feet in hot water, the child's legs have to be held below the knees. 10 R.R. 184. He testified that a squirming, twisting, thirty-pound weight would be very difficult to control in mid-air, even without the requirement of forcible straightening of the child's legs.

Dr. Lawrence further testified that, if the 30-pound weight is a child who is struggling, the stress on the back rises quickly, perhaps upward of 60 foot-pounds of stress, and holding such a child would be difficult for a man like Kenneth. 10 R.R. 191. Given Shelley's physical problems, it would also be difficult for her. 10 R.R. 193.

Dr. Lawrence stated that a person with problems in the lower back needs to keep lifted objects close to the body to decrease strain on the back. 10 R.R. 234. Holding the weight away from the body transfers mechanical stress from a "distribution of muscles" to the same stress on only a few muscles. In addition, the child had to be held exactly at the same height for the entire period of immersion. If the child had been moved up and down while suspended, the severity of the burns would not be uniform, as the top of the burned area would not be immersed for the entire 10 to 15 seconds and would therefore display burns of a lesser severity, producing a gradient of second-degree burns on the parts of the foot that were constantly under water and first-degree burns at the top of the burned area, which would have been immersed intermittently. 10 R.R. 185. He concluded that such a scenario does not comport with the observed injuries.

During direct examination, Dr. Lawrence described how the burns could have occurred accidentally. He agreed with the suggestion that the children might have locked themselves in the bathroom, as they had done several times before. Based on the physical evidence and his experience, he suggested that one possible way that Bridget's burns could have occurred was that one of the children put the rubber stopper in the drain hole, and one of the two children turned on the hot-water faucet. Because Nicholas was not burned, and therefore was not in the tub, that child was probably Bridget.

He further stated that, when first turned on, hot-water faucets put out cool water, and the temperature of the water gradually increases as the cool water that was standing in the pipes that connect the water heater to the faucet runs into the tub and is followed by heated water. Because the bottom of the tub slopes, the water initially pools around the drain, then spreads up and out toward the back of the tub. The cooler water is pushed toward the back of the tub, and for a time that area remains cooler than the area near the faucet, but eventually it becomes very hot. As the temperature

rose, Bridget may have retreated to the higher end.

At some point, Bridget may have recognized that the water was burning her and tried to get out. The pictures of the tub that are in the record show that the tub had a sliding shower door and that the opening was at the faucet end. Those pictures also show a goodly number of bottles floating in the water near the faucet, and the children had an extensive history of throwing bottles and other objects[15] into the tub when they played in it. Bridget may have gone to the opening in the shower door to get out, but found Nicholas standing in the opening, throwing bottles, and blocking the opening. Nicholas may not have realized how hot the water was and that Bridget needed to get out quickly.

While blocked, Bridget may have moved around, possibly flamingo-ing–raising one foot out of the water, then changing feet–until she was able to grasp the bottom of the outer shower door, pulling it into the track of the inner door. Using that leverage she would have been able to pull herself over the rim of the tub, scratching her chest and thigh on the shower-door track as she did so.

Dr. Lawrence was asked about his opinion about putting locks on the bathroom doors.

Q    Okay. Having actual locks on the door, was that significant to you when you saw that?

A    Absolutely. It told me that the children had a problem with getting in the tub and that the parents were diligent in finding mechanisms to keep them from getting into that tub.

Q    Now, let's be clear. You're not telling this jury that there was not some neglectful supervision involved here; is that true?

---

[15]  State's exhibit 41 shows the faucet end of the tub. Floating in the water are eight plastic bottles and one face cloth. State's exhibit 71 shows the faucet end of the tub after the tub was drained. Seven plastic bottles and one face cloth are laying on the bottom of the tub. Missing is a Baby Magic bottle that is seen floating in State's exhibit 41.

A    No. There–there was not good supervision on this particular morning.

10 R.R. 199.

Dr. Lawrence's medical opinion was that Bridget's injuries were accidental.

The state called as a witness the lead investigator, Det. Michelle Brock, who testified about the interrogations of Amanda, Kenneth, and Shelley, her inspection of the Walkers' home, and her investigation of the allegations against the Walkers. The investigation began after CPS contacted Det. Brock. 9 R.R. 43.

Det. Brock's testimony about her investigation began with her account of what Amanda told her and what Amanda told Det. Elliott, who told Det. Brock what Amanda had said. 9 R.R. 47-52. She continued her testimony with a description of her tour of the Walkers' home, sponsoring a number of photographs of the home as State's exhibits 49-71. 9 R.R. 55-60. She also sponsored the admission into evidence of the two video interrogations of Kenneth and the two interrogations of Shelley, state's exhibits 72-75, and the transcriptions of those interrogations, state's exhibits 72A, 73A, 74A, and 75A. All four interrogations were played for the jury.[16] The next section of Det. Brock's testimony was about the contents of the video interrogations and her personal reaction to them. 9 R.R. 61-81. In response to a question from the state, she testified that hot water is a deadly weapon. 9 R.R. 83.

On cross-examination, Det. Brock stated that she had been a detective for four years and that

---

[16] Without explanation, the transcripts contain five notations of "(redacted portion)." In the video of the first interrogation of Shelley, there are three such notations. In each case, the sound is missing during questioning. State's exhibit 72, 14:34:11-14:34:30, 14:38:24-14:38:31, 14:44:28-14:44:39. When the video of the second interrogation of Shelley is viewed, that notation also occurs when the sound is missing. The video shows Det. Brock writing on her note pad, tearing it out of the binding, and turning it so Shelley can see it. The gap appears to contain some discussion about the writing. State's exhibit 75, 11:53:50-11:54:40. The second video interrogation of Kenneth contains one such notation, and again, the audio portion is missing. Det. Roberts is cut off mid-sentence. State's exhibit 74, 15:14:47-15:15:22. Leaving Kenneth alone, Det. Brock exits at 15:25:59, stating, "If you'll hang tight for me real quick, I'll make sure we're done." Before she returned, the video ended at 15:54:04. *Id*. It is unclear whether the audio portion was intentionally silenced or the audio system malfunctioned.

this was the first time she had come to court to testify about immersion burns. Defense counsel asked what led her to believe that the Walkers had injured Bridget.

Q    Okay. Then please tell this jury what information you had, other than what you've heard from other people, what physical evidence, studies did you have that led you to believe that this–something had occurred that was the fault of Shelley and Kenneth Walker?

A    We had injuries to Bridget. She's incapable of making those injuries.

9 R.R. 97.

Det. Brock conceded that, in the arrest affidavit on which the arrest warrants for the Walkers were based, she wrote that the lack of splash marks were a clear indicator that Bridget legs had been deliberately scalded. At trial, she equivocated. She testified, "I believe that splash marks could be indicative of either it being accidental or non-accidental. It could go either way." Later, she said, "Because it could indicate either. It's a clear indicator. It can indicate that she was burned within an immersion situation." She also stated, "I believe that she was forcefully immerged [sic]." She did not know how hot the water was at the faucet or that, regardless of where the temperature of the water was obtained–the water heater or the tub faucet–the water was not hot enough to produce splash marks.

Det. Brock agreed that Bridget, because of being almost three years old and small, could not step into the tub one foot at a time, but also asserted, based on her training and experience, that "[t]echnically, a child that small is not going to be able to get into the bathtub themselves anyway." When asked if she had questioned any of the Walkers about Bridget's ability to get into the tub by herself, Det. Brock agreed that such information would be important. But she also discounted information from Amanda that the two children had flooded the bathrooms in the past and disapproved of the Walkers' choice to place locks on the bathroom doors in order to prevent more

floods.[17]

On re-direct examination, the state asked Det. Brock why she had chosen to arrest both Walkers. She responded that, based on the evidence, she could not rule either one of them out. Det. Brock also stated that, based on the type of injuries that Bridget had, Bridget's age, and Det. Brock's personal opinion that the Walkers had a high frustration level from caring for these children–evidenced by the locks on the doors and Nicholas's ADHD and autistic issues, it was her opinion that both Walkers "were capable of doing it."

In response, defense counsel asked Det. Brock whether, in her view, appellants were guilty of injury to a child even if they had not been present at the time of Bridget's injury. She responded, "They were still in the care, custody, and control of Mr. and Mrs. Walker."

Defense counsel also asked about Det. Brock's knowledge of the family's medical issues: Kenneth's heart attack, dual-chamber pacemaker, stroke, and back problems, and Shelley's arthritis and chronic pain. Det. Brock did not consider those issues important.

> Q     And did you factor any of that into whether or not either Shelley or Kenneth
>         was capable of doing this?
>
> A     I don't think it's a–I don't think it's relevant. They're able to–they're mobile.
>         They're able to walk around.

9 R.R. 128.

Defense counsel extensively questioned Det. Brock about her explanation of the event. He asked if Nicholas could have blocked Bridget's exit from the tub. At first, she stated that "Nicholas

---

[17] Det. Brock opined that, instead of creating physical barriers, the Walker should have done what she had done with her only child, who was ADHD.

> Q     And you're telling me that child never got out of your sight?
> A     No. I watched him all the time.
> Q     All the time, 24 hours a day?
> A     When he was not in school, yes.

9 R.R. 105-10.

is just as little as Bridget. I just don't see him being able to forcefully hold her in there." Counsel reminded her that he was asking about blocking, not holding her down. At first, Det. Brock said, "I don't believe he could do that," but then conceded that he could. She also conceded that her assertion that one or the other of the Walkers had injured Bridget because they were frustrated with Nicholas was her personal position and was not supported by her investigation or the evidence.

The state briefly addressed the absence of any interview by Det. Brock, or any one else, of Bridget herself.[18]

Q (by state) How long has it been since you've seen Bridget since this investigation?

A      I believe it's probably been the end of March.

Q      All right. Did you see her–after you interviewed the defendants, did you see Bridget?

A      I did.

Q      All right. Was she able to walk when you saw her?

A      She was not.

9 R.R. 82-83.

On further questioning, Det. Brock conceded that Bridget "was sedated a lot of the time when I called up there to Parkland."[19]  9 R.R. 150.

## I. Applicable Law

The federal Constitution requires that a criminal conviction be supported by evidence "necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense." *Jackson v. Virginia*, 443 U.S. 307, 316 (1979). In reviewing a conviction for the

---

[18]  Based on the record, no one talked to Nicholas, either.

[19]  Five days after the event, Bridget climbed over high rails on her hospital crib and was found lying on the floor with a bump on her head.

sufficiency of the evidence, a Court must ask "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319; *see also Adames v. State*, 353 S.W.3d 854, 860 (Tex. Crim. App. 2011).

The jury is the sole judge of credibility and weight to be attached to witness testimony. *Jackson*, 443 U.S. at 319 (it is the fact finder's duty to "fairly [ ] resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."). When the record supports conflicting inferences, we presume that the jury resolved the conflicts in favor of the verdict and therefore defer to that determination. *Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013).

A reviewing Court must permit juries to draw multiple reasonable inferences from facts, so long as each is supported by the evidence presented at trial. *Id.*; *see also Hooper v. State*, 214 S.W.3d 9, 16-17 (Tex. Crim. App. 2007) (courts of appeals should "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict."). But, as this Court explained in *Hooper*, the jury is "not permitted to come to conclusions based on mere speculation or factually unsupported inferences or presumptions" because doing so is not sufficiently based on facts or evidence to support a finding of guilt beyond a reasonable doubt. *See id.* at 15; *Temple*, 390 S.W.3d at 360; *see also Gross v. State*, 380 S.W.3d 181, 188 (Tex. Crim. App. 2012) ("Juries are permitted to draw reasonable inferences from the evidence, but they are not permitted to draw conclusions based on speculation."). "Speculation is mere theorizing or guessing about the possible meaning of facts and evidence presented." *Hooper*, 214 S.W.3d at 16. "A conclusion reached by speculation may not be completely unreasonable, but it is not sufficiently based on facts or evidence to support a finding

beyond a reasonable doubt." *Id.*

A conviction that is based upon juror speculation raises only a suspicion of guilt, and mere suspicion is inadequate to satisfy the constitutional sufficiency standard that requires proof beyond a reasonable doubt. *See Winfrey v. State*, 323 S.W.3d 875, 882 (Tex. Crim. App. 2010) ("[i]f the evidence at trial raises only a suspicion of guilt, even a strong one, then that evidence is insufficient" to sustain the conviction) (quoting *Urbano v. State*, 837 S.W.2d 114, 116 (Tex. Crim. App. 1992)). Thus, "[i]f, given all of the evidence, a rational jury would necessarily entertain a reasonable doubt as to the defendant's guilt, the due process guarantee requires that we reverse and order a judgment of acquittal." *Swearingen v. State*, 101 S.W.3d 89, 95 (Tex. Crim. App. 2003).

## II. Analysis

In order to uphold appellants' convictions in these cases, this Court must conclude that there is a sufficient factual basis upon which a rational jury could have concluded that appellants intentionally or knowingly caused Bridget serious bodily injury by forcibly immersing her in scalding water. *See* TEX. PENAL CODE § 22.04(a)(1). After reading the record and viewing the evidence in the light most favorable to the verdict, we conclude that the evidence in this case would "merely raise[] a suspicion of guilt" amongst rational jurors and thus is insufficient to support a conviction for injury to a child beyond a reasonable doubt. *See Winfrey*, 323 S.W.3d at 882.

While many of the witnesses set out what they believed had happened, none of the nineteen witnesses could testify as to what actually happened, who was present when the injuries occurred, or who was at fault. Their various opinions were based on factors derived from training and prior experience combined with the nature of the burns. What a rational jury could have determined beyond a reasonable doubt is only that, at around 8:30 a.m. on February 28, 2012, Bridget suffered second-degree burns on her lower legs while her legs were immersed in hot water in the Walkers'

master-bedroom bathtub.

The primary evidence relied upon by the state in this case was the expert testimony which suggested, but did not rise to the level of proving beyond a reasonable doubt, that Bridget's burns were intentionally inflicted. When asked by the state whether he could tell if a burn injury had been inflicted intentionally or accidentally, Dr. Wolf answered that he could describe the "depth of the injury" and "the likely circumstances [ ] by which it occurred," but he did not suggest that he could positively identify the particular type of injury in this case as being accidental or intentional.

In response to the prosecutor's questioning about the hypothetical ways in which Bridget's injury could have been sustained, Dr. Wolf stated that it was "improbable" that Bridget had accidentally crawled into the bathtub "by herself," turned the water on, and remained standing there for the ten to fifteen seconds that it would have taken for the burn to occur because "it would hurt while it was going on, and it would take a fairly long time." Based on his common-sense assessment that Bridget, on her own, would have gotten out of the bathtub before sustaining such burns to her feet, Dr. Wolf suggested that the injury was "more probably [sic] with a non-accidental injury."

But this assessment by Dr. Wolf was based on a hypothetical situation in which he assumed that (1) Bridget was by herself in the bathroom and (2) she was physically capable of getting out of the bathtub as soon as she realized that her feet were burning.[20] Neither of these assumptions was

---

[20] This hypothetical was put forth by the state as follows:

Q (state): Would it be consistent with—you know, would you expect a three-year-old just to stand there in 131-degree water?

A (Dr. Wolf): No.

Q    By themselves, just stand there in water, would you expect that?

A    No. And I don't think I need to be a doctor to make that conclusion either.

. . .

Q    Would it be consistent with a three-year-old crawling into the tub by herself and turning on the hot water by herself and just standing there?

A    That's improbable. . . . It's un—it's the—in all probability this is a non-accidental, because a child would not typically stand in water that could scald her to this degree for 10 to 15 seconds without some struggle to get out and some signs thereof.

established by the facts in the record. To the extent that the jury relied on Dr. Wolf's testimony as a basis for concluding that Bridget's burns were intentionally inflicted, the jury would have been required to speculate as to whether (1) Bridget was physically capable of quickly exiting the bathtub on her own in less than 15 seconds after realizing that her feet were burning, and (2) that no one, including Nicholas, was blocking or slowing her exit from the bathtub. Because the assumptions underlying Dr. Wolf's opinion in this case were not supported by the evidence, even if his testimony is viewed in a light most favorable to the verdict, it cannot rationally be said to establish intentional injury beyond a reasonable doubt under the actual circumstances.

Moreover, defense counsel's questioning on cross-examination that addressed the particular facts of this case caused Dr. Wolf to qualify the opinion he had provided on direct examination. Defense counsel asked Dr. Wolf about the fact that the burn on Bridget's left leg was slightly higher than the burn on her right leg and whether that might be consistent with a child who has walked toward the tub drain on her own and is trying to get out of the tub. Dr. Wolf agreed that that was "conceivable." He also agreed that the fresh scratches on Bridget's body were possibly sustained when she tried to crawl out of the tub. Defense counsel noted those two pieces of evidence, then asked Dr. Wolf whether it was still his opinion that the evidence suggested non-accidental injury. Dr. Wolf refined his opinion to say, "So my contention is that she was—she was unable to get out of the water—for a prolonged period of time, however that occurred."

Defense counsel also elicited a statement from Dr. Wolf that it was true that the fact that Bridget's feet were burned on the bottom "means she was probably moving around in the bathtub," as opposed to having her feet forced to the bottom of the tub by someone holding her down, which

---

6 R.R. 115-16.

would have produced sparing. Thus, on cross-examination, Dr. Wolf appeared to revise the opinion he gave on direct examination, and instead indicated that, although it was clear that Bridget had been unable to quickly exit the bathtub, thereby suffering burns, the reason for her inability to quickly exit the tub—whether it was the product of a mere accident or the result of someone forcing her into the tub or keeping her from getting out of the tub—was not clear. Dr. Wolf also stated that he did not know the mechanism of the burns, only that Bridget could not get out of the water quickly enough to avoids burns, "however that occurred."

When asked whether, given the lack of sparing and the uniformity of the burns, Bridget must have been suspended in the water, Dr. Wolf answered, "I don't know. All I can tell you is she had burns straight across the top, right, which is indicative of an immersion and has a uniform burn that—what is—there is no sparing, as you've demonstrated[.]"

Viewing the entirety of Dr. Wolf's testimony in a light most favorable to the jury's verdict and considering his uncertainty as to both the nature of the injury—accidental or intentional—and the mechanism of the injury, we conclude that this testimony would have necessarily called for speculation by the jury and, therefore, a rational jury could not have relied on this testimony as a basis for concluding that appellants intentionally caused Bridget's injuries.

Aside from the testimony of Dr. Wolf, the only other evidence that could be said to prove that appellants intentionally injured Bridget was the testimony of Dr. Cox. Compared to Dr. Wolf's testimony, Dr. Cox's was more definite in opining that Bridget's injury was non-accidental. Like Dr. Wolf, Dr. Cox suggested that, had Bridget accidentally gotten into the water, she could have "easily climb[ed] out" before sustaining such burns, and thus the fact that she was burned was suggestive of forcible immersion. In reaching this conclusion, Dr. Cox, like Dr. Wolf, necessarily assumed that Bridget would have been able to get out of the bathtub quickly enough—within 10 or

perhaps 15 seconds at the estimated water temperature—to avoid being burned had she been unrestrained by either appellant.

But Dr. Cox did not base his opinion on the particular facts of this case; he acknowledged in his testimony that he did not know how hot the water was (or, therefore, how long it would have taken for Bridget to sustain second-degree burns), nor did he know the shape or dimensions of the bathtub or bathtub door. In addressing the particular features of Bridget's injuries that led him to conclude that this was an intentional injury, Dr. Cox stated that Bridget's burns were "very symmetric" on both feet; "very uniform" as to depth; there was a distinct "water line" between the burned and unburned skin; and there was a lack of splash marks.

Dr. Cox relied both on the distinctiveness of the water line and the lack of splash marks to suggest that, had Bridget been unrestrained and splashing around in the hot water while trying to get out of the tub, this motion would have produced "waves" of water that would have reduced the evenness of the water line and would further have produced splash burns on her legs. The difficulty with Dr. Cox's opinion in this regard, however, is that, again, he formed it without knowing the crucial fact that the undisputed maximum temperature of the water coming from the faucet would not have been hot enough to cause these types of "wave" or "splash" burns. Dr. Cox did admit that the likelihood of splash burns "would depend on the water temperature" and that he "had no direct knowledge of the water temperature." The record further shows that, in forming his expert opinion in this case, Dr. Cox had estimated the water to be between 135 and 140 degrees, which was well above the established maximum temperature of the water in this case.

Because Dr. Cox's expert opinion was based, in part, on an assumption about a water temperature that is inconsistent with the facts in this case, we conclude that a rational jury could not have relied on Dr. Cox's opinion as a basis for determining that appellants intentionally caused

Bridget's injuries.

Dr. Cox also conceded that Bridget "either was in there accidentally and was walking around on her own, or . . . she was forcibly submerged in this hot water and held, but elevated." Although Dr. Cox ultimately concluded that the burns were "non-accidental," he acknowledged that there were no bruises or grasp marks to suggest that Bridget had been forcibly immersed.

The legal sufficiency standard of review does not require us to decide "what happened"; we only have to be satisfied that a jury could rationally answer that question for themselves beyond a reasonable doubt. *Merritt v. State*, 368 S.W.3d 516, 527 (Tex. Crim. App. 2012) (stating that an appellate court acts improperly "as a thirteenth juror when it speculate[s] and focuse[s] on the existence of a reasonable hypothesis inconsistent with the guilt of the accused").

This case turns on the reliability of the expert witness testimony to establish how the child was injured and whether those injuries were intentionally inflicted. We have previously considered the reliability of scientific evidence when answering whether that evidence could be legally sufficient to support a conviction. *Winfrey v. State*, 323 S.W.3d 875, 882-84 (Tex. Crim. App. 2010). In *Winfrey*, the State relied upon a dog-scent lineup to prove that the defendant had been in direct contact with the murder victim's clothing. *Id.* at 878. However, we did not credit that evidence in our legal-sufficiency analysis because the science underlying the dog-scent lineups was unreliable. *Id.* at 882-84. Given the unreliability of the dog-scent evidence, we held that it had no direct inculpatory value. *Id*. at 884 ("To the extent that lower court opinions suggest otherwise, we overrule them and expressly hold that when inculpatory evidence is obtained from a dog-scent lineup, its role in the court room is merely supportive.").

While the science and methodology of the experts in this case is certainly reliable, the expert conclusions about the conduct causing the injuries were not. Our sister court has recognized that,

even when an expert's scientific methodology is sound, an expert's opinion may nevertheless be too speculative or conclusory to be considered probative for purposes of a legal-sufficiency review. *Coastal Transp. Co. v. Crown Cent. Petrol. Corp.*, 136 S.W.3d 227, 233 (Tex. 2004). For example, in *Volkswagen of America, Inc. v. Ramirez*, the Court considered a negligence action involving a car accident. 159 S.W.3d 897 (Tex. 2004). A plaintiff's accident-reconstruction expert concluded that the rear wheel of the plaintiff's car came loose from the axle before the accident rather than after, and therefore caused the accident. *Id.* at 902. Another expert pointed to several facts to show that the wheel bearing had failed and noted that, after the accident, grass was found in the hub of the detached wheel. *Id.* at 911. Yet, this expert could not explain how the wheel had detached before the accident but, nevertheless, remained in the car's wheel well while the car crossed the median and collided with another car. *Id.* The Court concluded that, even if the expert's methodology was reliable, his conclusion was not reliable because the facts on which he relied did not support his expert opinion. *Id.*

The same flaw exists in this case. One expert, Dr. Cox, opined that the lack of splash marks indicated forced immersion. But because he did not know the temperature of the water at the time of incident, his conclusion was unsupported by facts. Additionally, Dr. Cox reached his conclusion without consideration of the physical abilities of the defendants to actually forcibly hold the victim in place. *Holloway v. State*, 613 S.W.2d 497, 502 (Tex. Crim. App. 1981) ("[R]elevance of the opinion to an issue in litigation is established only if the expert's conclusion is based upon facts either proved or assumed.").

For his part, Dr. Wolf was made aware at trial of how physically difficult it would have been for Kenneth to hold the victim's feet in the tub. In light of that information, he acknowledged that it would be "pretty difficult" for Kenneth to commit the offense. Ultimately, he could conclude only

that the "most probable" explanation was forced immersion, though he also allowed that forced immersion was "as plausible as anything else." This does not establish the guilty conduct beyond a reasonable doubt.

Even with their considerable expertise in burn injuries and child abuse, neither Dr. Cox nor Dr. Wolf had expertise in bio-mechanics. Their explanation and demonstrations of how Kenneth might have held the victim's feet in the scalding water were necessarily more speculative than their opinions regarding the burns themselves. While this testimony might have been supportive evidence of Kenneth's guilt, it was not based upon sufficient facts or expertise to be considered as direct evidence of intentional conduct.[21] *Winfrey*, 323 S.W.3d at 884; *Holloway*, 613 S.W.2d at 503.

Our Legislature recently acknowledged that a guilty verdict may be unjust where it is based upon either "bad science" or "bad scientists." Tex. Code Crim. Proc. art. 11.073 (b), (d). In *Winfrey*, we presaged this legislative enactment by refusing to rely upon "bad science" within our legal-sufficiency analysis because the evidence was based upon unreliable methodology. *Winfrey*, 323 S.W.3d at 882-84. Here, we take the next, necessary step and hold that a conclusory expert opinion based upon insufficient facts is not probative evidence. Consistent with our sister Court's precedent, we put less probative weight upon conclusions by "bad scientists" whose opinions may be scientifically inaccurate despite their reliance upon sound science and methodology. *Volkswagen*, 159 S.W.3d at 911; *see also Ex parte Robbins*, 478 S.W.3d 678, 693 (Tex. Crim. App. 2014) (Johnson, J., concurring) ("A scientist may not intend to present bad science, nor must that scientist be a bad scientist in every situation. Linus Pauling won a Nobel Prize in chemistry and would certainly be a good scientific witness if he testified about his work in chemistry. However, he would

---

[21] To the extent that the jury could have relied upon the lead detective's opinion that the child's injuries were caused by intentional conduct, that opinion was similarly unsupported.

be a bad scientist presenting bad science if he were called as a witness to the unlimited powers of vitamin C.").

Holding that the expert opinions are too conclusory to be direct evidence of guilty conduct is also consistent with the legal-sufficiency standard set out in *Jackson v. Virginia*. As we noted in *Brooks v. State*, the *Jackson v. Virginia* legal-sufficiency standard does not blindly defer to a jury's credibility determinations; it allows for some consideration of whether the jury's credibility determinations were rational in light of the objective evidence. *Brooks v. State*, 323 S.W.3d 893, 907 (Tex. Crim. App. 2010). We gave an example of a store clerk in a robbery to illustrate this concept:

> The store clerk at trial identifies A as the robber. A properly authenticated surveillance videotape of the event clearly shows that B committed the robbery. But, the jury convicts A. It was within the jury's prerogative to believe the convenience store clerk and disregard the video. But based on *all* the evidence the jury's finding of guilt is not a rational finding.

*Id.* (quoting *Johnson v. State*, 23 S.W.3d 1, 15 (Tex. Crim. App. 2000) (McCormick, P.J., dissenting)). Reducing conflicts in expert-opinion testimony to simple credibility determinations without considering whether the opinions themselves are adequately supported fails to ask whether the jury's credibility choice was rational.

As we noted in *Coble v. State*, some studies have shown that juror reliance upon an expert's credentials is directly proportional to the complexity of the information presented: the more complex the information, the more the jury looks to the background, experience, and status of the expert himself rather than to the content of his testimony. 330 S.W.3d 253, 281 (Tex. Crim. App. 2010). We also noted that jurors value medical expertise higher than other scientific expertise. *Id.* An expert's appeal to the juror's own common sense may be considerably more persuasive than a counterintuitive and complex, but empirically verified, theory. *Id.* These studies point generally to

a jury's potential to "irrationally" credit an expert's testimony without considering whether the expert's opinion is fully supported.

The human desire to defer to an "expert" is innate and not always rational. In this case, the jury acted irrationally in deferring to the experts' unsupported conclusions that Kenneth, Shelley, or both of them, intentionally caused the injury to the victim when they found the defendants guilty of the offense of intentional injury to a child. We do not know, nor can we know, how the child came to be injured without resort to speculation. Putting a scientific gloss over that speculation does not make the evidence more certain. Both defendants are entitled to an acquittal.

### III. Conclusion

Given the number of outstanding questions about whether the injury was accidental or intentionally inflicted, how this alleged offense might have been committed, and who might have committed it, we conclude that a rational jury would have had at most only a strong suspicion of guilt under these circumstances, therefore, we hold the evidence insufficient and render judgments of acquittal.[22]

Because the evidence is insufficient to establish that either appellant was responsible for Bridget's injuries, we decline to reform the judgment to any lesser-included offense under these circumstances. *See, e.g., Thornton v. State*, 425 S.W.3d 289, 300 (Tex. Crim. App. 2014) (permitting reformation of the judgment if the jury has "necessarily found" all elements of the lesser-included offense beyond a reasonable doubt and if the evidence is sufficient as to that offense.).

---

[22] "If, given all of the evidence, a rational jury would necessarily entertain a reasonable doubt as to the defendant's guilt, the due process guarantee requires that we reverse and order a judgment of acquittal." *Swearingen v. State*, 101 S.W.3d at 95.

Delivered: October 19, 2016
Do not publish